Exhibit C

United States District Court
For the Northern District of California

1
2
3
4
5
6                 IN THE UNITED STATES DISTRICT COURT
7
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9
10    UNITED STATES OF AMERICA,                No. CR 06-00645 WHA
11          Plaintiff,
12    v.                                       **ORDER GRANTING MOTION TO
                                               DISMISS INDICTMENT**
13    GONZALO LOPEZ-HERNANDEZ,
14          Defendant.
15    _____/
16
                        **INTRODUCTION**
17
          In this illegal-reentry prosecution, defendant Gonzalo Lopez-Hernandez moves to
18
      dismiss the indictment. He contends that his underlying deportation was flawed and that he is
19
      entitled to collaterally attack that deportation pursuant to 8 U.S.C. 1326(d). For the reasons
20
      stated below, Lopez-Hernandez's motion is **GRANTED**.
21
                        **STATEMENT**
22
          Lopez-Hernandez is a native and citizen of Mexico. In 1970, at age four, he entered the
23
      United States lawfully with his parents. In 1971, he was granted status as a legal permanent
24
      resident of the United States. In the 1980s and 1990s, he was convicted of several
25
      misdemeanors, including use of a controlled substance, theft, driving under the influence,
26
      driving on a suspended license, resisting a public officer, inflicting injury on a co-habitant, and
27
      cruelty to a child (Lopez Decl. Exhs. L, M). In August 1994, Lopez-Hernandez pled guilty to
28
      felony possession of heroin. He was sentenced to six months imprisonment and two years

1  probation.  When he violated his probation in 1996, he was sentenced to another eight months

2  in prison.  In March 1996, Lopez-Hernandez pled guilty to felony possession of heroin in

3  Sonoma Superior Court.  He was sentenced to three years imprisonment (Gov. Req. for Judicial

4  Notice Exh. 4).

5        After serving his sentence for the 1996 conviction, the INS commenced deportation

6  proceedings against him by serving him with a notice to appear in October 1997.  The notice to

7  appear alleged that Lopez-Hernandez was deportable as an alien convicted of an aggravated

8  felony as defined by Section 101(a)(43) of the Immigration and Nationality Act and as a

9  controlled substance violator (Lopez Decl. Exh. C).

10       In December 1997, a deportation proceeding was held for Lopez-Hernandez in El

11  Centro, California.  It is that proceeding Lopez-Hernandez challenges in the instant motion.

12  During the proceeding, Lopez-Hernandez was not represented by counsel.  The immigration

13  judge found that Lopez-Hernandez was deportable both as an aggravated felon and as a

14  controlled substance violator.  The IJ told Lopez-Hernandez that he was ineligible to apply for

15  cancellation of removal or any other form of relief from deportation (Gov. Req. for Judicial

16  Notice Exh. 5 at 22–23).  Immediately following the hearing, the IJ entered an order that

17  Lopez-Hernandez be deported (Gov. Req. for Judicial Notice Exh. 6).

18       Following the hearing, Lopez-Hernandez timely appealed the IJ's deportation order to

19  the Board of Immigration Appeals.  In July 1998, the BIA denied the appeal and affirmed the

20  deportation order, holding that his second drug conviction was an "aggravated felony" within

21  the meaning of Section 101(a)(43)(B) of the Immigration and Nationality Act (Gov. Req. for

22  Judicial Notice Exh. 8).  Lopez-Hernandez was deported in November 1999.

23       Lopez-Hernandez reentered the United States and was convicted a third time for felony

24  possession of a narcotic in 2000.  He was sentenced to another three-year term of imprisonment.

25  Following this imprisonment, Lopez-Hernandez again came to the attention of the INS.  In

26  October 2000, the government charged him with illegal reentry in violation of 8 U.S.C. 1326.

27  In November 2000, he pled guilty to the Section 1326 charge.  He was sentenced to 30 months

28

2

United States District Court
For the Northern District of California

1    in prison and one year of supervised release by Judge Susan Illston of this district (Gov. Req.

2    for Judicial Notice Exhs. 10, 14).

3        In 2004, after he completed his prison term, the Department of Homeland Security

4    reinstated Lopez-Hernandez's earlier deportation order and removed him from the United States

5    (Lopez Decl. Exhs. I, J, K). Lopez-Hernandez has returned again. In September 2006, DHS

6    located him following a petty theft misdemeanor conviction (Lopez Decl. Exhs. L, M). He is

7    currently being charged with another Section 1326 violation.

8                                        **ANALYSIS**

9    **1.    COLLATERAL ATTACKS OF DEPORTATION ORDERS.**

10       A defendant charged with violating Section 1326 may contest the validity of the

11   underlying deportation. "Because the underlying removal order serves as a predicate element of

12   an illegal reentry offense under § 1326, a defendant charged with that offense may collaterally

13   attack the removal order under the due process clause." *United States v. Pallares-Galan*, 359

14   F.3d 1088, 1095 (9th Cir. 2004). A prior deportation order cannot serve as a predicate for a

15   subsequent prosecution under 8 U.S.C. 1326 when the deportation proceedings giving rise to

16   the order were fundamentally flawed. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837

17   (1987); 8 U.S.C. 1326(d). To prevail in a collateral attack on a prior deportation on grounds

18   that the deportation proceedings were fundamentally flawed, defendant must show that: (1) he

19   exhausted any administrative remedies that were available to seek relief against the order,

20   (2) the deportation proceedings at which the order was issued improperly deprived him of the

21   opportunity for judicial review, and (3) the entry of the order was fundamentally unfair. *See*

22   *Pallares-Galan*, 359 F.3d at 1095 (citing 8 U.S.C. 1326(d)). With respect to the fundamental

23   unfairness requirement, defendant must show: (1) that his "due process rights were violated by

24   defects in the underlying deportation proceeding," and (2) that "he suffered prejudice as a result

25   of the defects." *United States v. Garcia-Martinez*, 228 F.3d 956, 960 (9th Cir. 2000).

26

27

28

**United States District Court**
For the Northern District of California

2.    **FORMER SECTION 212(C).**

Before 1996, Section 212(c) of the Immigration and Nationality Act was a form of relief from deportation that an IJ could exercise in his or her discretion with respect to certain aliens. *See United States v. Andrade-Partida*, 110 F. Supp. 2d 1260, 1263 (N.D. Cal. 2000).  To be eligible to apply for Section 212(c) relief, a person had to meet three requirements:  (1) the immigrant must have been a lawful permanent resident with seven years of lawful unrelinquished domicile, (2) the immigrant must not have been deportable based on certain firearms or explosives crimes, and (3) the immigrant must not have been incarcerated for five years for one or more aggravated felonies. *See* 8 U.S.C. 1182(c) (1995).  Immigrants who were eligible to apply for Section 212(c) relief, however, still had to show that a balancing of equities favored relief. *See Paredes-Urrestarazu v. I.N.S.*, 36 F.3d 801, 810 (9th Cir. 1994).

In 1996, Congress severely restricted Section 212(c) relief by enacting the Antiterrorism and Effective Death Penalty Act of 1996 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.  With those statutes, Congress effectively eliminated any discretionary forms of relief for individuals previously convicted of any "aggravated felony." *I.N.S. v. St. Cyr*, 533 U.S. 289, 297 (2001).

In his instant motion to dismiss the indictment, defendant collaterally attacks his 1997 deportation.  He contends that the 1997 proceeding was flawed because the IJ failed to inform him of an opportunity for discretionary relief from deportation through former Section 212(c).

3.    **EFFECT OF PRIOR CONVICTION UNDER 8 U.S.C. 1326.**

The government contends that Lopez-Hernandez admitted that the 1997 deportation order was valid when he pled guilty to violating Section 1326 in 2000.  The government specifically points out that in his plea agreement he agreed:  (1) to "give up all rights" to raise any "Fifth Amendment claims" and "to pursue any affirmative defenses and present evidence," (2) "not to file any collateral attack on [his] convictions or sentence" at any time in the future after he was sentenced, and (3) that he could move for a 30-month fast-track sentence even

4

1    though he was not technically eligible for a fast-track disposition (Gov. Req. Jud. Notice Exh.

2    12 at 2, 3).

3         The government is correct that a "guilty plea conclusively admits all factual allegations

4    of the indictment." *United States v. Kubick*, 205 F. 3d 1117, 1129 (9th Cir. 1999). The plea

5    agreement, however, does not preclude Lopez-Hernandez from collaterally attacking or

6    challenging the 1997 deportation order. This is true even though the deportation whose validity

7    he conceded in 2001 is the same deportation he challenges in the instant motion. The relevant

8    Ninth Circuit authority holds that "[i]n federal criminal trials, the United States may not use

9    collateral estoppel to establish, as a matter of law, an element of an offense or to conclusively

10    rebut an affirmative defense on which the Government bears the burden of proof beyond a

11    reasonable doubt." *United States v. Smith-Baltiher*, 424 F. 3d 913, 920 (9th Cir. 2005); *see also*

12    *United States v. Arnett*, 353 F.3d 765, 766 (9th Cir. 2003). Accordingly, the government may

13    not claim that Lopez-Hernandez here is estopped as a matter of law from contesting the validity

14    of the 1997 deportation order.

15         Moreover, the plea agreement limited Lopez-Hernandez's ability to challenge his

16    conviction and sentence in the 2001 criminal case. Lopez-Hernandez is not challenging his

17    2001 conviction for violating Section 1326. His agreement to waive his right to appeal or

18    otherwise collaterally attack his conviction in *that* case is thus not implicated by the instant

19    motion.

20        **4.**    **RELEVANCE OF 2004 REINSTATEMENT OF 1997 DEPORTATION ORDER.**

21         Lopez-Hernandez does not challenge the process afforded him during the 2004

22    reinstatement process. He challenges only the original 1997 deportation order that was later

23    reinstated in 2004. The government contends that Lopez-Hernandez was validly removed in

24    2004 after he served his sentence for the 2001 Section 1326 conviction. According to the

25    government, even if Lopez-Hernandez's 1997 deportation order was flawed, the 2004 order

26    reinstating the 1997 deportation order was valid. In the government's view, the 2004

27

28

**United States District Court**
For the Northern District of California

5

1    reinstatement can therefore be used to establish the deportation element in the instant

2    prosecution, regardless of the validity of the 1997 deportation order.

3         Whether a reinstatement can satisfy the prior-deportation element of Section 1326 where

4    the underlying deportation order was flawed appears to be an open question in the Ninth

5    Circuit.  For the reasons stated herein, this order holds that for purposes of establishing a prior

6    deportation, the government may not rely solely on a reinstatement order if the underlying

7    deportation did not comport with due process.  A defendant may challenge the underlying

8    deportation order on due process grounds.

9         Turning first to the statute's language, Section 1326(a)(1) makes clear that the order of

10   removal — not just the defendant's prior physical removal from the country — is an essential

11   component of a Section 1326 violation.  That section provides that "any alien who . . . has been

12   . . . removed . . . while an *order* of exclusion, deportation, or removal is outstanding, and

13   thereafter" returns to the United States without permission, is guilty of a violation of Section

14   1326.  The distinction between a "physical removal" and an "order of removal" is important.  In

15   *United States v. Luna-Madellaga*, 315 F.3d 1224, 1226 (9th Cir. 2003), the Ninth Circuit

16   examined Section 1326(b)(2), which provided enhanced criminal penalties — up to twenty

17   years imprisonment — for an immigrant who returned unlawfully and "whose removal was

18   subsequent to a conviction for commission of an aggravated felony."  8 U.S.C. 1326(b)(2).  The

19   defendant there had been deported in 1995, had been convicted of an aggravated felony in 1996,

20   and had his 1995 deportation order reinstated in 1999.  Pursuant to the reinstatement, he was

21   removed in 1999.  The Ninth Circuit held that the defendant was subject to the enhanced

22   penalty for his 1996 aggravated felony because Section 1326(b)(2) only spoke of "removal."

23   Analyzing the statutory text, the court stated:  "All that the statute requires is that the alien

24   reenter the United States illegally after having been removed subsequent to an aggravated

25   felony conviction.  It plainly turns on the aliens' *physical* removal — not the *order* of removal."

26   *Luna-Madellaga*, 315 F.3d at 1226.

27

28

*United States District Court*
*For the Northern District of California*

6

**United States District Court**
For the Northern District of California

1     Section 1326(a)(1), on the other hand, requires more than just a physical removal.  It

2  also requires that the defendant have been removed "while an order of exclusion, deportation, or

3  removal is outstanding."  8 U.S.C. 1326(a)(1).  The reinstatement statutory provision states: "If

4  the Attorney General finds that an alien has reentered the United States illegally after having

5  been removed or having departed voluntarily, under an order of removal, *the prior order of*

6  *removal is reinstated* from its original date and is not subject to being reopened or reviewed, the

7  alien is not eligible and may not apply for any relief under this chapter, and *the alien shall be*

8  *removed under the prior order* at any time after the reentry."  8 U.S.C. 1231(a)(5) (emphasis

9  added).  Reading these statutes together, in the Section 1326 context, one cannot ignore the

10  underlying deportation order even if there has been a subsequent reinstatement.  The propriety

11  of the new criminal charge depends upon the original deportation order.  A challenge to the

12  validity of a prior deportation under Section 1326(d) must allow for challenges to both the

13  reinstatement and the original deportation order.

14     At one time, the Ninth Circuit had a published opinion that addressed this very point.

15  *See United States v. Martinez-Vitela*, 183 F.3d 1131, 1136 (9th Cir. 1999), *withdrawn and*

16  *superseded by* 193 F.3d 1047, *withdrawn by* 213 F.3d 1205 (9th Cir. 2000).  That opinion was

17  withdrawn and superseded several times until it was finally disposed of as an unpublished

18  memorandum.  *See United States v. Martinez-Vitela*, 225 F.3d 665, 2000 WL 687698 (9th Cir.

19  2000) (unpublished).  The portion of that decision discussing issues relevant to the instant

20  motion was unchanged throughout the various iterations.  The reasoning of *Martinez-Vitela* is

21  sound and this order relies on it only as persuasive authority.

22     *Martinez-Vitela* involved a Section 1326 criminal prosecution.  The indictment only

23  alleged that Martinez-Vitela had been removed from the United States following his

24  reinstatement.  The indictment did not mention his original deportation.  Nevertheless, the Ninth

25  Circuit held:

26          [W]here the government relies on a reinstatement proceeding as
            the predicate deportation or removal for a § 1326 prosecution, the
27          alien maintains the limited right under *Mendoza-Lopez* to show

28                                             7

United States District Court
For the Northern District of California

that the original proceeding was "so procedurally flawed that it 'effectively eliminate[d] the right of the alien to obtain judicial review,'" and that the due process violation prejudiced him. *United States v. Alvarado-Delgado*, 98 F.3d 492, 493 (9th Cir. 1996) (*en banc*) (quoting *Mendoza-Lopez*, 481 U.S. at 840). If the underlying proceeding violated due process as described in *Mendoza-Lopez* and the alien was prejudiced by that deficiency, neither the reinstatement proceeding nor the original proceeding which was reinstated may be used as the predicate offense for the § 1326 prosecution. *See Alvarado-Delgado*, 98 F.3d at 493.

*Martinez-Vitela*, 2000 WL 687698, at *4; 193 F.3d at 1053; 183 F.3d at 1136. It was thus the *Martinez-Vitela* court's understanding that it was improper to rely solely on a reinstatement to establish a Section 1326 violation — even where the indictment omitted any reference to the underlying deportation.[1]

The Third Circuit considered this question recently and resolved the issue as the *Martinez-Vitela* court did. In *United States v. Charleswell*, 456 F.3d 347, 351–52 (3d Cir. 2006), the government argued that the court lacked jurisdiction to review the defendant's original deportation order, "signaling [the government's] belief that Charleswell's conviction [was] premised solely on the 2001 Reinstatement and consequently, that Charleswell [was] precluded from a collateral challenge to the original 1991 Deportation." The Third Circuit disagreed, stating:

> [U]nder *Mendoza-Lopez*, an alien may mount, and we must hear, a challenge to the validity of both a reinstatement order and the original deportation or removal order. *See generally United States v. Luna*, 436 F.3d 312 (1st Cir. 2006) (discussing, but not deciding, which of two deportation orders could act as a basis for an illegal re-entry indictment); *Ramirez-Molina v. Ziglar*, 436 F.3d 508 (5th Cir. 2006). To hold otherwise would allow the government to avoid the consequences of a fundamentally unfair underlying deportation or removal proceeding simply by deleting it from the indictment, in contravention of the teaching in *Mendoza-Lopez* that "where a determination made in an administrative proceeding is to play *a critical role* in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza-Lopez*, 481 U.S. at 837–38 (first emphasis added).

---

[1] *Mendoza-Lopez* was the Supreme Court decision holding that a criminal defendant could collaterally attack a deportation order if the deportation was so procedurally flawed that it "effectively eliminate[d] the right of the alien to obtain judicial review." 481 U.S. at 839.

Reinstatement orders do not exist independent and separate from their prior orders of removal but are instead explicitly premised on the prior order. *See* 8 U.S.C. § 1231(a)(5); *Ramirez-Molina*, 436 F.3d at 514. Consequently, the prior order remains a critical element of the reinstatement and, more importantly, of the illegal re-entry charge where that charge is premised on the reinstatement. Thus, insofar as the underlying element of the § 1326 proceeding is the reinstatement order, an alien may attempt to collaterally challenge both the original deportation order and the reinstatement order. And, where either proceeding — the reinstatement or the original — is so procedurally flawed that it "effectively eliminated the right of the alien to obtain judicial review," we may invalidate the criminal charges stemming therefrom. *See Mendoza-Lopez*, 481 U.S. at 839.

This order holds that the appropriate course is the one charted by the *Martinez-Vitela* and *Charleswell* courts. Indeed, the Ninth Circuit has assumed without discussion that a defendant may collaterally attack the original deportation even if the defendant had later been removed via reinstatement. In *United States v. Leon-Paz*, 340 F.3d 1003, 1004–05 (9th Cir. 2003), the defendant had been deported once in 1997. He returned to the United States several times and was removed again pursuant to two reinstatements of the 1997 order — one in 1999 and one in 2001. During the criminal prosecution for his third reentry, he raised a *St. Cyr*-based challenge similar to that of Lopez-Hernandez here. In *Leon-Paz*, the Ninth Circuit considered the validity of the 1997 deportation without reference to the subsequent reinstatements. *Leon-Paz* seems to signal an implicit understanding that even while reinstatements may comport with due process, a defendant can still collaterally attack the original removal order on the basis that it violated due process.

The analysis is not changed by the Ninth Circuit's recent *en banc* decision in *Morales-Izquierdo v. Gonzales*, __ F.3d __, 2007 WL 329132, at *9 (9th Cir. Feb. 6, 2007) (*en banc*). *Morales-Izquierdo* was not a criminal prosecution. There, the petitioner appealed directly from the reinstatement of his prior deportation order. The Ninth Circuit held that "a previously removed alien who re-enters the country illegally is not entitled to a hearing before an immigration judge to determine whether to reinstate a prior removal order." The court also stated that "[r]einstatement of a prior removal order — regardless of the process afforded in the

9

United States District Court
For the Northern District of California

1    underlying order — does not offend due process because reinstatement of a prior order does not

2    change the alien's rights or remedies." In support of that conclusion, the Ninth Circuit stated:

3    "The *only* effect of the reinstatement order is to cause Morales' removal, thus denying him any

4    benefits from his latest violation of U.S. law, committed when he reentered the United States

5    without the Attorney General's permission in contravention of INA § 212(a)(9), 8 U.S.C.

6    § 1182(a)(9). The reinstatement order imposes no civil or criminal penalties, creates no new

7    obstacles to attacking the validity of the removal order, and does not diminish petitioner's

8    access to whatever path for lawful entry into the United States might otherwise be available to

9    him under the immigration laws." *Id.* at *8 (citation omitted).

10          The *Morales-Izquierdo* court's assessment of the reinstatement process in the civil

11   immigration context does not hold where criminal penalties are at stake. Permitting the

12   government to rely solely on the reinstatement of an unlawful order *would* create additional

13   criminal penalties and *would* create new obstacles to a criminal defendant challenging the

14   original order pursuant to Section 1326(d). The defendant would be completely foreclosed

15   from challenging the original deportation order regardless of the process afforded by the

16   original order. The defendant would face criminal penalties as a result. Such a system would

17   directly contradict the Supreme Court's pronouncement that due process permits a collateral

18   attack of an administrative proceeding where that proceeding plays "a critical role in the

19   subsequent imposition of a criminal sanction." *Mendoza-Lopez*, 481 U.S. at 837–38. The

20   original deportation order is a keystone of a Section 1326 prosecution. Due process requires

21   consideration of that order if a criminal defendant challenges its validity pursuant to 1326(d).

22          Finally, this order notes that the unique circumstances of Lopez-Hernandez's case have

23   made it nearly impossible for him to bring his instant *St. Cyr*-based challenge prior to this

24   prosecution. *St. Cyr* was not issued until June 2001. While Lopez-Hernandez theoretically

25   could have made the *St. Cyr* argument during his original hearing in 1997, he cannot be faulted

26   for failing to foretell the Supreme Court's eventual holding. The same was true in 2000 when

27   he pled guilty to violating Section 1326. *St. Cyr* was handed down four months after he was

28

1    sentenced in 2001.  At oral argument in this case, the government contended that during his

2    time in prison, Lopez-Hernandez could have filed a habeas corpus petition to challenge his prior

3    deportation.  The government forgets, however, that Lopez-Hernandez was bound by his plea

4    agreement, in which he had promised not to collaterally attack his conviction or sentence.

5    Following his release in 2004, his deportation was immediately reinstated.  The reinstatement

6    statute, however, states that during a reinstatement, "the prior order of removal is reinstated

7    from its original date *and is not subject to being reopened or reviewed.*"  8 U.S.C 1231(a)(5)

8    (emphasis added).  This proceeding appears to be the first during which Lopez-Hernandez could

9    challenge his 1997 deportation order pursuant to *St. Cyr*.

10        **5.   EFFECT OF *ST. CYR*.**

11        The government next contends that the primary decision upon which Lopez-Hernandez

12    relies, *I.N.S. v. St. Cyr*, 553 U.S. 289 (2001), does not apply because Lopez-Hernandez's case is

13    in a different procedural posture from the petitioner's in *St. Cyr*.  In *St. Cyr*, the petitioner pled

14    guilty to selling a controlled substance in violation of Connecticut law.  That aggravated felony

15    made him deportable.  Under pre-IIRIRA and pre-AEDPA law, St. Cyr would have been

16    eligible for Section 212(c) relief.  Following the passage of IIRIRA and AEDPA, however,

17    Section 212(c) was effectively repealed and he was precluded from seeking other discretionary

18    relief because of his aggravated felony conviction.  *See* 8 U.S.C. 1229b(a)(3).  The INS

19    commenced proceedings against St. Cyr after both AEDPA and IIRIRA became effective.  The

20    BIA denied his request for Section 212(c) relief on the ground that Section 212(c) had been

21    repealed.  *See St. Cyr*, 533 U.S. at 293.

22        The Court then considered whether the language of IIRIRA repealing Section 212(c)

23    should be given retroactive effect.  The Court first determined that the language of the statute

24    did not sufficiently demonstrate that Congress intended the repeal of Section 212(c) to apply

25    retroactively.  The Court then considered the expectation and reliance interest of immigrants

26    who, like St. Cyr, entered into plea bargains to preserve the availability of Section 212(c) relief.

27    The Court concluded that because St. Cyr, "and other aliens like him, almost certainly relied

28

11

1    upon that likelihood in deciding whether to forgo their right to a trial, the elimination of any

2    possibility of Section 212(c) relief by IIRIRA has an obvious and severe retroactive effect."

3    Accordingly, the Court determined that Section 212(c) "relief remains available for aliens, like

4    respondent, whose convictions were obtained through plea agreements and who,

5    notwithstanding those convictions, would have been eligible for Section 212(c) relief at the time

6    of their plea under the law then in effect." *Id.* at 315–26.

7          The government contends that the holding in *St. Cyr* was limited to factual situations

8    analogous to that decision. Specifically, the government believes Section 212(c) relief should

9    remain available only for immigrants who are subject to removal but who have not yet been

10   removed. According to the government's theory, a person charged with a Section 1326

11   violation cannot retroactively benefit from *St. Cyr* because his deportation order is not open on

12   direct review.

13         The government's opposition ignores that the Ninth Circuit has retroactively applied *St.*

14   *Cyr* to reverse a Section 1326 conviction where the defendant may have been eligible for relief

15   previously under Section 212(c). *See United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1050

16   (9th Cir. 2004); *see also United States v. Leon-Paz*, 340 F.3d 1003, 1006–07 (9th Cir. 2003)

17   (holding that criminal defendant's "case is a congener of St. Cyr's, and like St. Cyr he was

18   entitled to be considered for § 212(c) relief"). In the Section 1326 prosecution in *Leon-Paz*, for

19   example, the Ninth Circuit held that there was a due process violation pursuant to *St. Cyr*. The

20   defendant in *Leon-Paz*, "like St. Cyr, was entitled to the continued protection of § 212(c), and

21   the IJ erred when he told [the defendant] that no relief was available." *Leon-Paz*, 340 F.3d at

22   1007. The Ninth Circuit remanded for the district court to consider in the first instance whether

23   the defendant had demonstrated prejudice. The Ninth Circuit also relied on *St. Cyr* retroactively

24   in *Ubaldo-Figueroa*. The court found that the defendant's underlying deportation was invalid

25   pursuant to *Leon-Paz* and *St. Cyr*, thereby requiring reversal of the defendant's conviction. The

26   Ninth Circuit found that the defendant had demonstrated prejudice and reversed his conviction

27   accordingly. *See Ubaldo-Figueroa*, 364 F.3d at 1050–51.

28

United States District Court
For the Northern District of California

1    The government's reliance on *Alvarenga-Villalobos v. Ashcroft*, 271 F. 3d 1169, 1172

2    (9th Cir. 2001), is misplaced. In *Alvarenga-Villalobos*, the Ninth Circuit held that an alien who

3    illegally returned to the United States after deportation could not collaterally attack his prior

4    deportation order. The Ninth Circuit considered whether *Magana-Pizano v. I.N.S.*, 200 F.3d

5    603, 613–14 (9th Cir. 1999), applied retroactively. In *Magana-Pizano*, the Ninth Circuit had

6    held that the provision of AEDPA that eliminated Section 212(c) relief for aggravated felons

7    should not be applied to people who were in deportation proceedings when the provision was

8    enacted on April 24, 1996. Alvarenga-Villalobos had been in proceedings at that time. The

9    *Alvarenga-Villalobos* court applied the "general rule of nonretroactivity for cases on collateral

10   review," pursuant to *Teague v. Lane*, 489 U.S. 288, 307 (1989), and held that *Magana-Pizano*

11   should not be applied retroactively to cases on collateral review. *See* 271 F. 3d at 1172–73.

12   The government contends that under *Alvarenga-Villalobos*, *St. Cyr* should not apply

13   retroactively to this case.

14   The government has made this argument based on *Alvarenga-Villalobos* before at least

15   two other district courts within this circuit. Both courts rejected the government's approach.

16   *See United States v. Romero-Sanchez*, CR 06-130-PHX-JAT, 2006 WL 1791300, at *1–*2 (D.

17   Ariz. June 27, 2006); *United States v. Mojica-Linos*, 399 F. Supp. 2d 1114, 1118–19 (E.D.

18   Wash. 2005). This order does the same. "[I]n *Ubaldo-Figueroa* (and other prior cases applying

19   *St. Cyr*) the Court of Appeals has de facto determined that *St. Cyr* is available to defendants

20   who are collaterally attacking their prior deportations in a subsequent prosecution for illegal

21   reentry after deportation." *Romero-Sanchez*, 2006 WL 1791300, at *2. Because the Ninth

22   Circuit has applied *St. Cyr* retroactively in other Section 1326 cases, this order does as well.

23   This order also rejects the government's contention that the Court should disregard

24   Lopez-Hernandez's "uncorroborated claim that he relied on the possibility of obtaining 212(c)

25   relief at the time he [pled] guilty to his aggravated felony drug offenses" (Opp. 12–13). The

26   government misinterprets *St. Cyr*. Nothing in that opinion requires a showing of actual reliance

27   by the immigrant on the possibility of obtaining Section 212(c) relief. Indeed, the Supreme

28

13

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Court stated: "There can be little doubt that, as a general matter, alien defendants considering

2  whether to enter into a plea agreement are acutely aware of the immigration consequences of

3  their convictions.  Given the frequency with which § 212(c) relief was granted in the years

4  leading up to AEDPA and IIRIRA, preserving the possibility of such relief would have been

5  one of the principal benefits sought by defendants deciding whether to accept a plea offer or

6  instead to proceed to trial."  *St. Cyr*, 533 U.S. at 322–23 (citations omitted).  Nor does Ninth

7  Circuit require a showing of actual reliance.  *See Garcia-Ramirez v. Gonzales*, 423 F.3d 935,

8  943–44 (9th Cir. 2005) (Fisher, J., concurring) ("Nor does our circuit law impose an additional

9  requirement that in order to establish reliance on the old law, a petitioner must in all

10  circumstances demonstrate actual, subjective reliance or a quid pro quo exchange to establish

11  impermissible retroactivity.").

12      **6.    COLLATERAL ATTACK ON 1997 DEPORTATION PROCEEDING AND ORDER.**

13          As stated above, to collaterally attack his 1997 deportation proceeding,

14  Lopez-Hernandez must demonstrate:  (1) that he exhausted all administrative remedies available

15  to him to appeal his removal order, (2) that the underlying removal proceedings at which the

16  order was issued improperly deprived him of the opportunity for judicial review, and (3) that

17  the entry of the order was fundamentally unfair.  *See Pallares-Galan*, 359 F.3d at 1095; 8

18  U.S.C. 1326(d).  This order holds that Lopez-Hernandez has satisfied each of these elements.

19      **A.    Exhaustion of Administrative Remedies.**

20          On December 31, 1997, Lopez-Hernandez, representing himself, filed a timely appeal of

21  the IJ's deportation order.  That appeal was denied by the BIA in July 1998 (Gov. Req. for

22  Judicial Notice Exhs. 7, 8).  The government does not appear to contest that Lopez-Hernandez

23  exhausted his administrative remedies.  Lopez-Hernandez meets the exhaustion requirement

24  because he allowed the "administrative agenc[y] to complete [its] own decisionmaking

25  procedures."  *Xiao v. Barr*, 979 F.2d 151, 154 (9th Cir. 1992).

26

27

28

**United States District Court**
For the Northern District of California

1

    **B.    Opportunity for Judicial Review.**

2        The next issue is whether Lopez-Hernandez's 1997 deportation proceeding improperly

3    deprived him of the opportunity for judicial review.  The Ninth Circuit has explained that

4    "where a waiver of the right to appeal a removal order is not 'considered and intelligent,' an

5    alien has been deprived of his right to that appeal and thus to a meaningful opportunity for

6    judicial review."  *Pallares-Galan*, 359 F.3d at 1096.  The government contends that

7    Lopez-Hernandez's appeal to the BIA reveals that he was not denied an opportunity for judicial

8    review.  After the BIA denied his appeal, the government contends that he "voluntarily decided

9    not to seek judicial review of the BIA's decision," and chose instead to "fail[] to report for his

10    deportation" (Opp. 13).  The government essentially contends that Lopez-Hernandez was

11    provided with — but chose to waive — an opportunity for judicial review.  This order

12    disagrees.

13        It is undisputed that the IJ informed Lopez-Hernandez of his right to appeal to the BIA.

14    The IJ did not, however, discuss with him the right to any subsequent judicial review by the

15    Ninth Circuit (Gov. Req. for Judicial Notice Exh. 5).  To address the government's argument,

16    that Lopez-Hernandez failed to petition for review before the Ninth Circuit is not evidence that

17    he was afforded an opportunity for judicial review.  He was never informed of the possibility of

18    a Ninth Circuit appeal.  "An alien cannot make a valid waiver of his right to appeal a removal

19    order if an IJ does not expressly and personally inform the alien that he has the right to appeal."

20    *Ubaldo-Figueroa*, 364 F.3d at 1049.

21        There is another independent basis for finding that Lopez-Hernandez was denied an

22    opportunity for judicial review.  "Where the record contains an inference that the petitioner is

23    eligible for relief from deportation, but the IJ fails to advise the alien of this possibility and give

24    him the opportunity to develop the issue, we do not consider an alien's waiver of his right to

25    appeal his deportation order to be considered and intelligent."  *Pallares-Galan*, 359 F.3d at

26    1096.  The Ninth Circuit has held that a failure to advise an immigrant of potential Section

27    212(c) relief pursuant to *St. Cyr* demonstrates a "depriv[ation] of judicial review in violation of

28

due process." *Leon-Paz*, 340 F.3d at 1004–07; *see also Ubaldo-Figueroa*, 364 F.3d at 1049

("We do not consider an alien's waiver of his right to appeal his deportation order to be

'considered and intelligent' when the record contains an inference that the petitioner is eligible

for relief from deportation, but the Immigration Judge fails to advise the alien of this possibility

and give him the opportunity to develop the issue."). In this case, if the IJ improperly failed to

inform Lopez-Hernandez of the possibility of a Section 212(c) waiver when such relief might

have been available, that was a due process violation depriving Lopez-Hernandez of an

opportunity for judicial review. *See, e.g., United States v. Andrade-Partida*, 110 F. Supp. 2d

1260, 1269 (N.D. Cal. 2000) ("In this case, the IJ's fundamental error prevented defendant from

applying for section 212(c) relief. For that reason, the IJ's error denied defendant the

opportunity to seek judicial review."). Whether the IJ should have advised Lopez-Hernandez of

possible Section 212(c) relief is discussed in the next section.

### C.    Fundamental Unfairness.

To satisfy the third prong of a collateral attack, that his deportation was "fundamentally

unfair," Lopez-Hernandez must show that:  (1) his deportation proceedings violated due

process, and (2) the defects in his deportation proceedings prejudiced him.

### (1)    *Due Process Violation.*

Lopez-Hernandez contends that he was deprived of due process when the IJ failed to

inform him of his right to apply for Section 212(c) relief from deportation. Under the

above-cited precedent, including *St. Cyr*, *Leon-Paz*, and *Ubaldo-Figueroa*, Lopez-Hernandez is

correct. It is undisputed that, had Section 212(c) been in effect at the time of the 1997

deportation proceeding, Lopez-Hernandez would have met the three requirements making him

eligible to apply for relief. *First*, he had been a lawful permanent resident with at least seven

years of lawful unrelinquished domicile. *Second*, he was not deportable based on specific

firearms or explosives crimes. *Third*, he had not been incarcerated for five years for one or

more aggravated felonies. *See* 8 U.S.C. 1182(c) (1995).

16

1   The IJ told Lopez-Hernandez that he was deportable based on his two possession

2   convictions, which qualified him as an aggravated felon and controlled-substance violator.  The

3   IJ also told him, however, that no discretionary avenues of relief were available.[2]  Under the

4   reasoning of *St. Cyr*, it was wrong for the IJ to so instruct.  At the time of the hearing before the

5   IJ, "§ 212(c) relief remain[ed] available for aliens, like [Lopez-Hernandez], whose convictions

6   were obtained through plea agreements and who, notwithstanding those convictions would have

7   been eligible for § 212(c) relief at the time of their plea under the law then in effect."  *St. Cyr*,

8   533 U.S. at 326.  At the time Lopez-Hernandez entered his pleas in 1994 and 1996, Section

9   212(c) relief would have been available to him.  It was thus a due process violation for the IJ

10  not to inform Lopez-Hernandez of that available relief.  *See United States v. Ortega-Ascanio*,

11  376 F.3d 879, 887 (9th Cir. 2004) ("[T]he IJ was required to advise Ortega-Ascanio that he was

---

14  [2] The following colloquy took place during the hearing:

| Immigration Judge: | All right.  I understand what you're telling me.  All your ties are to the United States.  Your conduct in essence by being convicted of these two crimes has gotten you into a position where there is no avenue for relief available to you under the evidence that's been presented to me at this time.  Congress has only mandated certain types of relief that I can take into consideration, and I think I've covered every one of them.  I don't think I've missed anything.  [INS counsel] Mr. Forestell, do you see any avenue for relief that I have oversighted or perhaps evaluated incorrectly? |
|---|---|
| Forestell: | No, Your Honor. |
| . . . | |
| Immigration Judge: | I don't see any avenues of relief that I have the authority to consider that could allow you to remain here.  Do you understand that? |
| Hernandez-Lopez: | Yes. |

17

1    eligible to apply for § 212(c) discretionary relief even if he had been convicted of an aggravated

2    felony.").

3          The government cites several inapposite decisions. The government first cites decisions

4    in which the Ninth Circuit held that "aliens have no fundamental right to discretionary relief

5    from removal for purposes of due process and equal protection." *Tovar-Landin v. Ashcroft*, 361

6    F.3d 1164, 1167 (9th Cir. 2004); *see also Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003).

7    That may be true, but *St. Cyr* and its related Ninth Circuit authority hold that a due process

8    inquiry is appropriate where the individual was not *advised* of possible discretionary relief. It is

9    a different question from whether or not the individual had a due process right to such relief.

10   *See, e.g., Leon-Paz*, 340 F.3d at 1007 ("When he was given *advice to the contrary* and, thus,

11   deprived of that possibility and of an appeal, his due process rights were violated.") (emphasis

12   added).

13         The government also relies on a Ninth Circuit decision which held that "the Due Process

14   Clause does not require the IJ to advise of potential constitutional challenges." *United States v.*

15   *Garza-Sanchez*, 217 F.3d 806, 811 (9th Cir. 2000). *Garza-Sanchez* is distinguishable because

16   Lopez-Hernandez is not basing his collateral attack on the IJ's failure to inform him of any

17   constitutional challenges. *See Andrade-Partida*, 110 F. Supp. 2d at 1269 (distinguishing

18   *Garza-Sanchez* for the same reason). Rather, he contends the IJ should have informed him of

19   the right to statutory relief under Section 212(c). The Ninth Circuit has consistently held that

20   the failure to advise an alien of the right to apply for available statutory relief is a due process

21   violation. *See Ubaldo-Figueroa*, 364 F.3d at 1049-50; *Ortego-Ascanio*, 376 F.3d at 886–87;

22   *Leon-Paz*, 340 F.3d at 1007.

23         Finally, in light of the preceding authority, this order must disagree with the

24   government's assertion that "it is nonsensical to argue that an IJ who follows then-existing

25   precedent, like [the IJ] did in this case, somehow violates due process" (Opp. 15). The Supreme

26   Court unequivocally held that "depriving removable aliens of consideration for § 212(c) relief

27   produces an impermissible retroactive effect for aliens who, like respondent, were convicted

28

United States District Court
For the Northern District of California

1    pursuant to a plea agreement at a time when their plea would not have rendered them ineligible

2    for § 212(c) relief. . . . IIRIRA's elimination of any possibility of § 212(c) relief for people who

3    entered into plea agreements with the expectation that they would be eligible for such relief

4    clearly attaches a new disability, in respect to transactions or considerations already past." *St.*

5    *Cyr*, 533 U.S. at 320–21. Pursuant to *St. Cyr*, Lopez-Hernandez should have been informed that

6    he was eligible to apply for Section 212(c) relief.

7                         **(2)    *Prejudice.***

8           This order now turns to the issue of prejudice. To demonstrate prejudice,

9    Lopez-Hernandez need not show that he actually would have been granted relief. "Instead, he

10   must only show that he had a 'plausible' ground for relief from deportation." *Ubaldo-Figueroa*,

11   364 F.3d at 1050 (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000)).

12          Applications for Section 212(c) waivers called on the IJ to consider and weigh various

13   factors. "In exercising his responsibility, an IJ must determine whether to grant section 212(c)

14   relief based on all the facts and circumstances of a particular case, taking into account the social

15   and humane considerations presented in an applicant's favor and balancing them against the

16   adverse factors that evidence the applicant's undesirability as a permanent resident."

17   *Yepes-Prado*, 10 F.3d at 1366–37. Factors would include whether the individual had shown

18   rehabilitation and the strength of equities such as length of time in the United States, close

19   family members with lawful status, residence of long duration in this country, evidence of

20   hardship to the immigrant and the immigrant's family upon deportation, history of employment,

21   good character, service in the United States Armed Forces, and evidence of rehabilitation.

22   Negative factors would include the nature and underlying circumstances of the exclusion or

23   deportation ground at issue; additional violations of the immigration laws; the existence,

24   seriousness, and recency of any criminal record; and other evidence of bad character or the

25   undesirability of the applicant as a permanent resident. *See id.* at 1366. In addition, "[t]he BIA

26   require[d] a showing of outstanding equities by applicants for discretionary relief who ha[d]

27

28

19

1   been convicted of serious drug offenses, particularly trafficking." *Ayala-Chavez v. I.N.S.*, 944

2   F.2d 638, 742 (9th Cir. 1991) (citing *Matter of Marin*, 16 I. & N. Dec. 581, 586 n. 4 (1978)).

3          As an initial matter, it is incorrect for the government to rely on events following

4   Lopez-Hernandez's first deportation to argue that he has shown no plausible ground for relief.

5   The Ninth Circuit has held that the relevant consideration in a prejudice determination is

6   whether "the BIA could plausibly have determined that he was [eligible for relief] *based on the*

7   *record before it.*" *Singh v. Ashcroft*, 367 F.3d 1182, 1189 (9th Cir. 2004) (emphasis added).

8   The Second Circuit has also held that "§ 1326(d)'s prejudice inquiry does not extend beyond

9   the fairness of the deportation order itself." *United States v. Scott*, 394 F.3d 111, 119 (2d Cir.

10  2005). What is relevant to an evaluation of prejudice is Lopez-Hernandez's "entire criminal

11  record *at the time of his deportation.*" Accordingly, this order only considers whether

12  Lopez-Hernandez had a plausible ground for relief at the time the IJ issued its deportation order

13  in 1997.

14         This order holds that Lopez-Hernandez had a plausible chance of obtaining a Section

15  212(c) waiver of deportation. With respect to the negative factors, it is recognized that

16  Lopez-Hernandez had a criminal history. His record included misdemeanor convictions for

17  inflicting injury on a co-habitant, for which he received probation and 30 days in jail, and

18  cruelty to a child, for which he received probation. He also had two felony convictions for

19  possession of heroin for which he was considered deportable.

20         Nevertheless, Lopez-Hernandez's favorable factors were strong. Lopez-Hernandez had

21  lived in the United States continuously since the age of four. He had been a lawful permanent

22  resident of the United States for twenty-seven years. While he was a young man, he had solid

23  work history picking grapes with other immigrant workers. His family used the money he

24  earned to support themselves. His three children, Ramon, Ticuas, and Carmen, were born in the

25  United States before 1997. Both of his parents were United States citizens. All eleven of his

26  siblings resided in the United States either as citizens or lawful permanent residents. The

27  "existence of substantial family ties in the United States is a weighty factor in the support of the

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    favorable exercise of discretion under § 212(c)." *Kahn v. I.N.S.*, 36 F.3d 1412, 1413 (9th Cir.

2    1994). Moreover, he had a close relationship with his citizen children since they were born, as

3    witnessed by his mother and his girlfriend. He also told the BIA that while in prison, he went to

4    numerous narcotics anonymous meetings in an attempt to rehabilitate himself. He also stated

5    that he had received his G.E.D. (Def. Exh. N ¶¶ 3, 4, 7, 8; Def. Exh. O ¶¶ 7, 9; Gov. Req. for

6    Judicial Notice Exh. 7). These attempts at rehabilitation would also be "considered in the

7    exercise of discretion." *In re Arreguin*, 21 I. & N. Dec. 38, 40 (B.I.A. 1995).[3]

8         This order holds that consideration of all the factors indicates that Lopez-Hernandez had

9    plausible grounds for Section 212(c) relief. This order so holds even if Lopez-Hernandez would

10   have had to demonstrate a heightened showing of "unusual or outstanding equities" in light of

11   his felony convictions for possession and prior criminal history. It is not clear, however, that he

12   would have had to make such a showing, which was generally required "when an alien ha[d]

13   been convicted of a serious drug offense, *particularly one relating to the trafficking or sale of*

14   *drugs*." *Matter of Edwards*, 20 I. & N. Dec. 191, 195 (B.I.A. 1990) (emphasis added). His

15   felony convictions were for possession, not drug trafficking.

16        This order takes into account the fact that prior to the elimination of Section 212(c),

17   relief under that provision was common. The Supreme Court recognized in *St. Cyr*: "[A]

18   substantial percentage of . . . applications for § 212(c) relief have been granted. Consequently,

19   in the period between 1989 and 1995 alone, § 212(c) relief was granted to over 10,000 aliens."

20   *St. Cyr*, 533 U.S. at 296. The Court cited the First Circuit's decision in *Mattis v. Reno*, 212

21   F.3d 31, 33 (1st Cir. 2000), which stated that "in the years immediately preceding the statute's

22   passage, over half the applications were granted." The Court also noted a study which had

23   found that "51.5% of the applications for which a final decision was reached between 1989 and

24   1995 were granted." These are compelling reasons that counsel against adopting the

25   _____

26        [3] After the IJ issued his order, Lopez-Hernandez married his girlfriend, Karen Lopez, in 1998. Lopez
     was the mother of his daughter Carmen, who was born in 1996. They had another daughter, Linda, in 2000.

27   Both Linda and Ms. Lopez are United States citizens (Def. Exh. P ¶¶ 4, 10). The facts of his marriage to a
     United States citizen and the birth of Linda, however, were not before the IJ during the 1997 hearing.

28

                                          21

1  government's view that Lopez-Hernandez's hypothetical 212(c) application would have been

2  implausible.

3                                    **CONCLUSION**

4       Lopez-Hernandez has satisfied the three requirements under 8 U.S.C. 1326(d), and has

5  successfully collaterally attacked his 1997 deportation order. Accordingly, for the foregoing

6  reasons, Lopez-Hernandez's motion to dismiss the indictment is **GRANTED**.[4]

7

8       **IT IS SO ORDERED.**

9

10  Dated:  February 23, 2007.                       

11                                    WILLIAM ALSUP
                                      UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

---

[4] Lopez-Hernandez submitted exhibits in support of his motion. The government's objection to defendant's Exhibits A, D, J, K, L, and M is SUSTAINED under Federal Rule of Evidence 901 for failure to authenticate. The government also objected to specific paragraphs of declarations submitted by defendant. Specifically, the government objected to paragraphs 6, 11, and 14 of Exhibit N; paragraphs 8 and 11 of Exhibit O; paragraphs 8, 9, and 11 of Exhibit P; and paragraphs 5, 6, and 7 of Exhibit Q. Those paragraphs were not relied on by this order so the objections are moot. Finally, Lopez-Hernandez opposes the government's request for judicial notice of certain documents. Specifically, Lopez-Hernandez opposes taking judicial notice of the government's Exhibits 1, 2, 3, 9, 11, 13, 15, and 16. As those documents were not relied on by this order, the request for judicial notice of those documents is moot. The government's request for judicial notice is GRANTED as to the remaining exhibits.

1  KEVIN V. RYAN (CSBN 118321)
   United States Attorney
2
   MARK L. KROTOSKI (CSBN 138549)
3  Chief, Criminal Division

4  JULIE A. ARBUCKLE (CSBN 193425)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, Box 36055
6      San Francisco, California 94102
       Telephone: (415) 436-7129
7
8  Attorneys for the United States of America

9                 UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12
   UNITED STATES OF AMERICA,         )    CR No. 06-0645 WHA
13                                    )
          Plaintiff,                  )    THE UNITED STATES' MEMORANDUM
14                                    )    OF POINTS AND AUTHORITIES RE:
       v.                             )    THE APPLICABILITY MORALES-
15                                    )    IZQUIERDO V. GONZALES
   GONZALO LOPEZ-HERNANDEZ,           )
16                                    )    Date:   February 20, 2007
          Defendant.                  )    Time:   2:00 p.m.
17  _____   )    Judge:  Honorable William H. Alsup

18
19
          Pursuant to the Court's request in its February 15, 2007 Notice re: Hearing, Plaintiff the United
20
   States of America (the "United States") submits this memorandum of points and authorities.
21
       A.  Under Morales-Izquieredo v. Gonzales, the 2004 Reinstatement of Removal Against Lopez-
22         Hernandez Satisfied Due Process.

23        Defendant Lopez-Hernandez's ("Lopez-Hernandez") arguments against his 1999 deportation,

24  even if accepted by the Court, do not merit dismissing his indictment in this case because there can

25  be and is no dispute that the 2004 reinstatement of removal satisfied due process.  The In Morales-

26  Izquierdo v. Gonzales, the Ninth Circuit recently held the statute and federal regulation governing

27  reinstatement proceedings, 8 U.S.C. §1231(a) and 8 C.F.R. §241.8, comport with due process.  Id.,

28  2007 U.S.App. LEXIS 2902 at 37 (9th Cir. February 6, 2007).  The Ninth Circuit specifically rejected

UNITES STATES' MEMORANDUM RE: MORALES-IZQUIEREDO V. GONZALES - CR No. 06-0645 WHA

1    the alien's claim that a removal order may not constitutionally be reinstated if the underlying

2    removal proceeding itself violated due process, holding:

3          <u>Reinstatement</u> of a prior removal order--<u>regardless of the process afforded in the</u>
            <u>underlying order--does not offend due process</u> because reinstatement of a prior order
4          does not change the alien's rights or remedies. The only effect of the reinstatement
            order is to cause Morales' removal, thus denying him any benefits from his latest
5          violation of U.S. law, committed when he reentered the United States without the
            Attorney General's permission in contravention of INA § 212(a)(9), 8 U.S.C. §
6          1182(a)(9).

7    <u>Id.</u>, 2007 U.S.App. LEXIS 2902 at 34-35 (2/6/07). The Ninth Circuit reasoned that to hold

8    otherwise, would "make a mockery of aliens who do respect our laws and wait patiently outside our

9    borders seeking lawful admission," as Morales could pursue a challenge to his prior removal order

10   from outside of the country, and "nothing in the Due Process Clause gives him the right to

11   manufacture for himself a new opportunity to raise such a challenge" by illegally reentering the

12   country. <u>Id.</u> at 36-37.

13        In <u>Morales-Izquierdo</u>, the Ninth Circuit also rejected the alien's claim that reinstatement

14   proceedings violate due process because they lack sufficient procedural safeguards. <u>Id.</u> at 30. In

15   holding that 8 C.F.R. §241.8 contains ample procedural safeguards to comport with due process, the

16   Ninth Circuit explained that before reinstating a removal order the immigration officer "must verify

17   the identity of the alien," "must obtain the prior order of exclusion, deportation, or removal relating

18   to the alien," and "must determine whether the alien reentered the United States illegally" by

19   considering all relevant evidence, including statements made by the alien and any evidence in the

20   alien's possession. <u>Id.</u> at 26. The Court further reasoned that the risk of error in reinstatement

21   proceedings is "extremely low." <u>Id.</u> at 30.

22        In sum, given that Lopez-Hernandez does not (and cannot) claim that the 2004 reinstatement of

23   removal violated due process, he is not entitled to dismissal of the indictment in this case.

24        B. <u>The 2004 Reinstatement of Removal Is an "Order of Removal" Under 8 U.S.C. § 1326.</u>

25        8 U.S.C. § 1326 makes it unlawful for an alien who "has been denied admission, excluded,

26   deported, or removed, or has departed the United States while an order of exclusion, deportation, or

27   removal is outstanding" to reenter or be found in the United States without permission from the

28   Attorney General or the Secretary for the Department of Homeland Security. An order to reinstate

1  an alien's prior deportation or removal order[1] is an order of "removal" under 8 U.S.C. § 1326(a) as

2  defined by the statute and regulation governing reinstatement.  8 U.S.C. §1231(a)(5) (Attorney

3  General may reinstate removal order to "remove" aliens who illegally reenter); 8 C.F.R. § 241.8(a)

4  (an alien who illegally reenters "shall be removed from the United States by reinstating the prior

5  order.")  In United States v. Luna-Madellaga, 315 F.3d 1224 (9th Cir. 2003), the Ninth Circuit made

6  clear that a violation of Section 1326 and the sentencing enhancement set forth therein for "removal"

7  after an aggravated felony conviction may be predicated on a reinstatement of a prior removal order.

8  Id. at 1226 ("That the 1999 removal was accomplished by reinstatement of his 1995 removal order

9  is of no consequence."); see also United States v. Portillo-Mendoza, 25 Fed.Appx. 543 (9th Cir.

10  2001) (unpublished) ("The Order to Reinstate Portillo-Mendoza's prior deportation is a "removal"

11  as defined by the statute and regulations.")  Thus, the 2004 reinstatement of removal against Lopez-

12  Hernandez may alone support the United States' Section 1326 indictment in this case.

13

14  DATED: February 16, 2007                    Respectfully submitted,
                                               KEVIN V. RYAN
15                                             United States Attorney

16                                                    /s/
                                               _____
17                                             JULIE A. ARBUCKLE
                                               Assistant United States Attorney

18

19

20

21

22

23

24

25

26

27  _____

28      [1] The Illegal Immigration Reform and Immigration Responsibility Act of 1996
("IIRIRA") replaced all references to "deportation" with "removal."  Morales-Izquierdo v.
Gonzales, 2007 U.S.App. LEXIS 2902 at 4 n. 3 (9th Cir. February 6, 2007).  Thus, "removal" now
encompasses both "exclusion" and "deportation."  Id. at 5 n. 5.

UNITES STATES' MEMORANDUM RE: MORALES-IZQUIEREDO V. GONZALES - CR No. 06-0645 WHA                    3